IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM JAMES VIEHL,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:09-CR-119<br><br>Judge Dee Benson |

This matter is before the court on defendant William James Viehl's Motion for Case Reassignment for Sentencing Based on Breach of Plea Agreement. (Dkt. No. 83.) On December 11, 2009, the court heard oral argument on the motion. The defendant was present and was represented by Heather Harris. The government was represented by John Huber. At the conclusion of the hearing, the court took the matter under advisement. Now, being fully advised in the matter, the court enters the following Memorandum Decision and Order.

## BACKGROUND

On March 4, 2009, William James Viehl was charged with damaging and interfering with the operations of the McMullin mink farm, located in South Jordan, Utah, in August of 2008. More specifically, Mr. Viehl was charged by Indictment with two counts of violating 18 U.S.C.

1

§ 43(a) (Damage and Interference with Animal Enterprises).

Plea negotiations ensued, and on September 2, 2009, Mr. Viehl entered a plea of guilty to Count I of the Indictment.  The plea agreement was outlined in a document titled Statement By Defendant In Advance Of Plea Of Guilty, filed in conjunction with the change of plea hearing. (Dkt. No. 70.)  Paragraph 12 of the statement, which sets forth the prosecution's obligations, provided as follows:

> The United States agrees:
>
> (1) To move to dismiss Count II at the time of sentencing;
> (2) *To recommend that the defendant* receive credit for accepting responsibility, and *be sentenced at the low end of the guideline range determined by the Court at sentencing*; and
> (3) To recommend, based upon the evidence, that the loss amount to be used for calculating the sentencing guideline range should not exceed seventy thousand dollars ($70,000)

(Statement By Defendant in Advance of Plea of Guilty, Dkt. No. 70, at 4 ¶ 12(B) (emphasis added).)

In preparation for sentencing, the United States Probation Office completed a presentence investigation on behalf of the court, and presented the report to the court and the parties.  The report included standard insight into the defendant's background as well as analysis of the crime and its impact.  The crime consisted of the defendant's actions on the evening of August 19, 2008, when he, allegedly in the company of codefendant Alex Jason Hall, entered upon the property of the McMullin mink farm and proceeded to release 500 mink from their cages, destroy animal pedigree cards in the farm's offices, and otherwise vandalize the mink operation's property.  The McMullin's barn was spray-painted with the expressions "ALF," "no

more mink, no more murder," and "We are watching." ALF is the acronym for Animal Liberation Front. The presentence report stated that after the attack, the defendant was hailed as a hero on numerous websites.

The report also included details of the defendant's involvement in an incident involving a mink farm in Kaysville, Utah, on September 21, 2008, which resulted in the release of approximately 6,000 mink and substantial damages to the victim. Additionally, the report detailed the defendant's involvement in an attempted raid on a mink farm in Hyrum, Utah, on September 4, 2008.

The presentence report calculated a guideline range of 6 to 12 months, based on a total offense level of 10 and a criminal history category of I.

On November 10, 2009, two days prior to the sentencing hearing, the defendant filed a written sentencing memorandum with the court. (Position of Defendant with Respect to Sentencing Factors, Dkt. No. 74.) In the sentencing memorandum the defendant agreed that a low-end guideline sentence of 6 months was reasonable, but also argued that the low-end sentence should be further reduced by 1.5 months, and that he should be given credit for time served on "house arrest"[1] prior to pleading guilty. (Dkt. No. 74 at 5.) Defendant argued that the factors set forth in 18 U.S.C. § 3553 supported such a reduction, and therefore the court should sentence defendant to "time served," and he should be released "to be supervised by United

---

[1]In June of 2009, Magistrate Judge Brooke C. Wells revoked defendant's pre-trial release. Although defendant acknowledges that Judge Wells did not order *per se* house arrest, given that defendant was only allowed to leave his house for employment searches and other pre-approved meetings, he asserts that these conditions effectively amounted to house arrest, and should therefore be counted as time against his sentence.

States Probation at sentencing." (Def.'s Position With Respect to Sentencing Factors, Dkt. No. 74 at 1-2.)

In preparing for the sentencing hearing, the court considered the defendant's sentencing memorandum, the presentence report prepared by probation, a victim impact statement, a letter from the defendant, as well as numerous letters from both defendant's supporters and those involved with the mink industry.

The matter came on for sentencing on November 12, 2009. At that time, consistent with the argument presented in defendant's sentencing memorandum, defense counsel stated: "I think what I wanted to focus on today are really the 3553 factors." (Tr. at 5.) Counsel represented to the court that the defendant regretted his actions, "has had a complete change of attitude" and "does not want to be involved in any illegal behavior again." (Tr. at 5-6.) In an effort to clarify defendant's position with regard to sentencing, the court inquired: "You're asking me for time served essentially, and let him out?" to which defense counsel responded, "yes, your honor." (Tr. at 21.)

The government began its presentation to the court by stating, "I want it to be clear that our commitment in the plea agreement is that we do recommend the low end of the guideline range that you determine to be applicable to [defendant] today." (Tr. at 7-8.) The government then proceeded to show a slide show, which included among other items, a picture of the crime scene as well as a 2008 Annual Report of the Animal Liberation Front's activities in North America, which referenced the crime in this case.

During the presentation, the government remarked that the crime had a "great impact on

the McMullin family" and the entire mink ranching industry.  The prosecutor stated: "It has been turned into a property crime and the guidelines treat it as a property crime but that does not quite capture the offense that was committed by Mr. Viehl."  (Tr. at 8.)  The prosecutor then recounted the details of the crime, and referenced the words painted on the McMullin's barn – "We are watching. ALF."  (Tr. at 9.)  In that context, he remarked, **"**It is not just a property crime, it is a threat." (Id.)  The prosecutor also provided the court with background information on the Animal Liberation Front, the manner in which the organization communicates and disseminates information, and remarked that "when Mr. Viehl signed up to commit this crime, it was not just for his own personal beliefs, it was for a broader purpose and a broader organization."  (Tr. at 9.)  He further stated, "that being the case . . . your sentencing decision will have a much broader impact than just on Mr. Viehl."  (Tr. at 9.)   In conclusion, the government explained:

> In making this presentation, Judge, we still recommend the low end of the guidelines that you find applicable, but I do not want the court to consider the request made in the sentencing memorandum in asking for an early release and walking out today after four and a half months, and giving him credit for pretrial supervision before Judge Wells took that away from him.

(Tr. at 10-11.)

Following the government's presentation, exercising his rights under the Crime Victim Rights Act, 18 U.S.C. § 3771, Mr. McMullin, the victim in this case, offered a lengthy statement.  Mr. McMullin detailed the impact of the crime on his family, including the emotional impact on his young children, and the financial impact on his family business.  (Tr. at 13 to 19.)

At the conclusion of the sentencing hearing, the court expressly acknowledged the government's recommendation, stating: "I recognize the government's recommendation for six

months, but I don't agree with it.  I certainly don't agree with [defendant's] request for release."  (Tr. at 24-25.)  The court then expressed its intention to impose a sentence above the guideline range.  In explaining why a sentence above the guidelines was appropriate in this case, the court referenced several relevant factors in § 3553, including the seriousness of the offense, the need to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct. (Tr. at 24.)  The court also referenced the presentence investigation, which included information about two separate mink farm incidents beyond defendant's conviction.  (Tr. at 26.)  Finally, the court remarked on the statements of Mr. McMullin, and of the terror this type of crime inflicts on the victims.  (Tr. at 22-23.)  However, in order to provide the defendant with an opportunity to respond to the court's stated intention, the court postponed the sentencing until December 11, 2009.  Thereafter, on December 3, 2009, defendant filed the present Motion to Reassign Case for Sentencing Based on Breach of Plea Agreement.  (Dkt. No. 83.)

In the motion now before the court, the defendant claims that the government's presentation during the sentencing hearing was inconsistent with its obligation under the plea agreement to "recommend the low end of the guidelines."  The defendant claims that the purpose of the government's argument was not simply to advocate for a low-end guideline sentence, but rather was to encourage the court to sentence the defendant to something beyond what the government was obligated to recommend.

In response, the government asserts that the defendant opened the door to the government's argument by asking for a below-guideline sentence of "time served."  According to the government, by doing this, the government was entitled to argue in support of what it

bargained for in the plea agreement.

## DISCUSSION

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v. New York, 404 U.S. 257 (1971); United States v. Brye 146 F.3d 1207, 1209 (10th Cir. 1998.)  Additionally, "[i]n order to comply with the plea agreement, the government cannot rely upon a 'rigidly literal construction of the language' of the agreement, nor may it accomplish 'through indirect means what it promised not to do directly'" United States v. Hand, 913 F.2d 854, 856 (10th Cir. 1990) (quoting United States v. Shorteeth, 887 F.2d 253, 256 (10th Cir. 1989)).

General principles of contract law define the content and the scope of the government's obligations under the plea agreement. United States v. Vandam, 493 F.3d 1194, 1199 (10th Cir. 2007); United States v. Cachucha, 484 F.3d 1266, 1270 (10th Cir. 2007); Peterson, 225 F.3d at 1171. Accordingly, the court looks to the express language in the agreement to identify both the nature of the government's promise and the defendant's reasonable understanding of this promise at the time of the entry of the guilty plea. Id.; see United States v. Peterson, 225 F.3d 1167, 1170-71 (10th Cir. 2000); United States v. Brye, 146 F.3d 1207, 1210 (10th Cir. 1998). All ambiguities are construed against the government, to the extent it is the drafting party. Brye, 146 F.3d at 1210. The court must evaluate the record as a whole to ascertain whether the government complied with its promise. Vandam, 493 F.3d at 1199; United States v. Rodriguez-Delma, 456 F.3d 1246, 1251 (10th Cir. 2006) (concluding after "consideration of the entire

record" that government did not breach plea agreement), cert. denied, 549 U.S. 1240 (2007).

Under the unambiguous language of the plea agreement in this case, Mr. Viehl agreed to plead guilty to Count I in exchange for the prosecutor's agreement "to recommend the low end of the guideline range determined by the court at sentencing."  (Dkt. No. 70, at 4 ¶ 12(B).) However, the government's promise to recommend the low end of the guidelines cannot reasonably be understood as a promise to say nothing in the face of defendant's argument for a *below*-guideline sentence of time served.  See, e.g., United States v. Hand, 913 F.2d 854, 857 n.4 (10th Cir. 1990) ("The government's agreement to recommend a two-level reduction cannot reasonably be interpreted as a promise not to interfere with [defendant's] abortive attempt at a greater reduction than the one recommended.").  Accordingly, when defense counsel argued to the court–in both a written sentencing memorandum and again at the hearing–that the defendant should receive a below-guideline sentence, the government was then free to make an argument in support of what it bargained for in the plea agreement.

The defendant claims that the government's arguments went beyond what was necessary to refute the argument for time served, and therefore the government breached the plea agreement by indirectly advocating for a higher sentence.  (Def.'s Mot. For Reassignment at 9, 13.)  Having determined that defense counsel opened the door to the government's argument, the court declines to undertake the challenging task (at defendant's urging) of attempting to decipher what *quantity* or *quality* of argument would have been sufficient to refute defense counsel's argument in support of time-served without impermissibly crossing the line and advocating for something beyond the low-end guideline sentence of 6 months.

Considering the entire record in this case, the court is persuaded that the government complied with its obligation under the plea agreement. The court knew fully well what the government was recommending after reading the presentence report and conferring with Probation prior to the sentencing hearing. Thereafter, during the sentencing hearing, on three separate instances the prosecutor affirmatively restated its recommendation of the low-end of the guidelines. (Tr. at 7, 10-11, 21.) On one of those occasions, the prosecutor expressly stated: "We still recommend the low end of the guidelines that you find applicable, but I do not want the court to consider the request made in the sentencing memorandum in asking for an early release and walking out today after four and a half months." (Tr. at 10-11.) The court is persuaded that, evaluating the record as a whole, these comments demonstrate that the government complied with its promise as contained in the plea agreement.

Moreover, the court is mindful that a sentencing recommendation is just that – a recommendation. If defendant wanted or required something stronger or more binding on behalf of the government, such as a limitation on oral argument or an agreement pursuant to Federal Rule of Criminal Procedure 11(c)1(C) he could have bargained for such during the plea negotiation process. In this case, although the entirety of the prosecutor's statements may have demonstrated a lack of unbridled enthusiasm for the recommendation, the Tenth Circuit has expressly stated that "[a] criminal defendant has no right, as a matter of law, to an 'enthusiastic' recommendation by a prosecuting attorney in compliance with a plea agreement." Hand, 913 F.2d at 857 (citing United States v. Benchimol, 471 U.S. 453, 455-56 (1985) (providing that the government, which agreed to make a sentencing recommendation as part of a plea bargain, was

under no implied-in-law requirement to explain its reasons or make its recommendation "enthusiastically").

      In light of the foregoing, and under these particular circumstances, the court finds that the government's statements at the sentencing hearing were not in breach the plea agreement. Therefore, defendant's motion is DENIED.

      Dated this 11th day of January, 2010.

*/s/ Dee Benson*

_____

Dee Benson
United States District Judge